**[J-45-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| HEATHER HONEY | : | No. 79 MAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court at No. 57 CD |
| | : | 2023, entered on March 4, 2024, |
| | : | Reversing the Lower Court Order of |
| LYCOMING COUNTY OFFICES OF | : | the Lycoming County Court of |
| VOTER SERVICES | : | Common Pleas at No. CV-22-00115- |
| | : | OR, entered on December 16, 2022. |
| | : | |
| APPEAL OF: JEFFREY J. STROEHMANN, | : | ARGUED: May 30, 2025 |
| DONALD C. PETERS, AND JOSEPH D. | : | |
| HAMM | : | |

**OPINION**

**JUSTICE McCAFFERY**                                    **DECIDED: April 28, 2026**

John Adams said: "[L]iberty cannot be preserved without a general knowledge among the people, who have a right … and a desire to know[.]"[1] The foundation of a democratic society rests on the knowledge that the results of our elections are accurate and trustworthy, otherwise the legitimacy of our government is put at risk. Roughly two centuries after John Adams, Ronald Reagan advised us to "trust, but verify."[2] Although

---

[1] *A Dissertation on the Canon and the Feudal Law*, No. 3, 30 September 1765, *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/06-01-02-0052-0006 (last accessed 4/22/2026). [Original source: *The Adams Papers*, Papers of John Adams, vol. 1, *September 1755–October 1773*, ed. Robert J. Taylor. Cambridge, MA: Harvard University Press, 1977, pp. 118–123.]

[2] President Ronald Reagan, *Remarks on Signing the Intermediate-Range Nuclear Forces Treaty*, December 8, 1987, https://www.reaganlibrary.gov/archives/speech/remarks-signing-intermediate-range-nuclear-forces-treaty (last accessed 4/22/2026).

originally uttered in the context of 1980s' arms control and foreign policy, that sage advice is apropos to our electoral process and the matter with which our Court is confronted here. This case is about how to satisfy the voting public that our elections are safe, secure, and accurate. And, at the same time, it is about how we preserve the guarantee of our State Constitution that a vote, once cast, will remain secret. In the present matter, our focus concerns a specific aspect of the voting process — cast vote records (CVRs). As will be discussed *infra*, we hold that CVRs are not the content of ballot boxes or voting machines as those terms are used in the Election Code. Therefore, CVRs are not exempt from public disclosure. Before we engage in our analysis, it is helpful to review how we arrived at the present issue.

## I. FACTS AND PROCEDURAL HISTORY

Lycoming County uses ClearVote, an election management system, to conduct its elections. Under the ClearVote system, each precinct has one scanner tabulator, which is a piece of equipment used to count votes. To vote, the voter completes a physical ballot and inserts it into a scanner. The scanner, in turn, reads the ballot and transmits the results to the tabulator for counting. The results from the tabulator are then transferred to Lycoming County's central tabulator. The ClearVote Cast Vote Record (CVR) for each precinct tabulator is a spreadsheet displaying raw data associated with the precinct. The CVR for the central tabulator is a spreadsheet displaying raw data associated with every ballot cast in Lycoming County.

On October 20, 2021, Heather Honey submitted a request to the Lycoming County Office of Voter Services (Voter Services) under the Commonwealth's Right-to-Know Law (RTKL)[3] seeking a digital copy of the CVR file for every Lycoming County precinct tabulator and central tabulator used in the 2020 General Election.

---

[3] 65 P.S. §§ 67.101-67.3104.

Voter Services denied Honey's RTKL request, explaining that the contents of ballot boxes and voting machines are not public pursuant to Section 308 of the Election Code, 25 P.S. § 2648.[4]  Honey appealed to the Office of Open Records (OOR).  Following briefing by the parties, the OOR issued a Final Determination denying her appeal.  In so doing, the OOR relied upon the affidavit of Forrest Lehman, the Lycoming County Director of Elections.  Lehman's affidavit detailed how votes are scanned and stored in Lycoming County and opined that CVRs fall within the "contents" exception to public inspection under Section 308. In his view, "[r]eviewing a CVR is the digital equivalent of inspecting the contents of a ballot box, one ballot at a time."  *Honey v. Lycoming County Offices of Voter Services*, 312 A.3d 942, 945-946 (Pa. Cmwlth. 2024) (*en banc*) (citation and internal quotation marks omitted).  Finding Lehman to be credible and knowledgeable, the OOR ultimately concluded the CVRs are not public records under Section 308 of the Election Code.

Honey appealed the OOR's decision to the Court of Common Pleas of Lycoming County (trial court).  Thereafter, Petitioners Jeffrey D. Stroehmann, Donald C. Peters, and Joseph Hamm (collectively, Appellants) — registered voters in Lycoming County whose interests aligned with Honey — filed a joint petition to intervene, which the trial court granted.  As an initial matter, the court determined Honey lacked standing to pursue the appeal and to obtain the CVRs she had requested because she was registered to vote in Lebanon County, rather than Lycoming County.  Thus, she was not a "qualified elector" under Section 308 of the Election Code.  *See* Opinion and Order, 12/16/2022, at 48-49.

---

[4] As will be discussed below, Section 308 generally permits "any qualified elector" to inspect "records of each county board of elections, general and duplicate returns, tally papers, affidavits of voters and others, nomination petitions, certificates and papers, other petitions, appeals, witness lists, accounts, contracts, reports and other documents and records in its custody, except the contents of ballot boxes and voting machines and records of assisted voters[.]"  25 P.S. § 2648.

Nonetheless, the trial court found Appellants had standing, in their own right, to pursue the same claims which Honey raised.  *See id.* at 49-50.

As to whether CVRs are exempt from public disclosure under Section 308, the trial court focused on the phrase "contents of ballot boxes and voting machines," which, the court noted, is not defined in the Election Code.  *See* Opinion and Order, 12/16/2022, at 53.  Analyzing the individual terms within that phrase, the trial court found the plain meaning of "ballot boxes" is consistent with its dictionary definition., *i.e.*, a "locked box into which ballots are deposited after voting."  *Id.* at 54 (quotation marks and footnote omitted).  As for the term, "voting machines," the court found that while there is no explicit statutory or appellate guidance with respect to the meaning of that term, it is clear the phrase does not include optical scanners that read paper ballots.  *See id.* at 56. The court made this determination because the General Assembly, and this Court, have made clear that electronic systems that use paper ballots are treated differently under the Election Code than electronic systems without paper ballots.  *See id.* at 55-56.  Lastly, the trial court found the word "contents" to be ambiguous because it is unclear whether "contents" refers solely to the physical contents of a ballot box or voter machine, or whether the term could refer to other intangible contents, such as ideas.  *See id*. at 57-58.

After examining the history and purpose of Section 308 and the Election Code as a whole, the court reasoned that the public access restriction in Section 308 was to be narrowly construed.  The court believed the General Assembly "intended the 'contents' of ballot boxes or voting machines to refer to voted ballots physically deposited into ballot boxes and the mechanical inner workings of voting machines, rather than the information 'contained' in those physical items."  Opinion and Order, 12/16/2022, at 68.  As a result, the trial court concluded the Lycoming County CVRs were not exempt from disclosure under Section 308 and, thus, were a public record which could be obtained *via* an RTKL

request. *See id.* The trial court further concluded that disclosure of the CVRs would not violate Pennsylvania's constitutional ballot secrecy requirement. *See id.* at 71-72. In support, the court pointed out that the order of the numbered list of voters in the CVRs does not necessarily correspond to the order in which ballots are cast, such that the randomization of data rendered remote any concerns about disclosures violating secrecy. *See id.* at 70-71. The trial court further observed that the constitutional secrecy guarantee does not require that a voter's selections may never be deduced through examination of various publicly available information, noting there are already situations where this is possible, *e.g.* (1) when only one person votes in a precinct and (2) when every voter in a precinct votes for the same candidate in a given race. *See id.* at 69-70.

Accordingly, the trial court ordered Voter Services to provide Appellants with the CVR from the 2020 General Election in Lycoming County but stayed its order for 30 days so it would not become effective until the appeal period had closed. *See* Opinion and Order, 12/16/2022, at 72-73.

Al Schmidt, in his Official Capacity as Secretary of the Commonwealth (Secretary), appealed to the Commonwealth Court, arguing that the trial court erred in finding Section 308 to be ambiguous. In addition, he argued that even if Section 308 is ambiguous, the trial court erred in failing to defer to the Department's statutory interpretation, *i.e.*, that the County's Electronic Voting System (EVS) and CVRs are not subject to disclosure. The Secretary alleged EVSs, like the ones used to record votes in Lycoming County, are the modern equivalent of voting machines, and CVRs are the "contents" of voting machines or ballot boxes; therefore, they are not subject to disclosure under Section 308. *See Honey*, 312 A.3d at 947.

## II. COMMONWEALTH COURT OPINION

In a published decision authored by Judge Ceisler, a divided, *en banc* panel of the Commonwealth Court reversed the trial court's order. The Commonwealth Court agreed with the Secretary's contention that the trial court erred by finding Section 308 to be ambiguous. As an initial matter, the Commonwealth Court observed that the Election Code is not a "model of clarity" with respect to what constitutes a "voting machine," because it does not define the term, and the relationship between voting machines and EVSs is not "straightforwardly apparent" from the text. *Honey*, 312 A.3d at 950.

The Commonwealth Court noted that Article XI-A of the Election Code,[5] which specifically pertains to EVSs, contains multiple references to voting machines[6] suggesting that they are components of EVSs, while at the same time containing provisions which "imply that EVSs and voting machines may, in fact, be entirely different kinds of apparatuses." *Honey*, 312 A.3d at 951 (citation omitted). The Court found clarity in dictionary definitions and common usages of the various terms at issue, noting that "machine" is commonly defined as "a mechanically, electrically, or electronically operated device for performing a task[,]" such that a "voting machine" may be described as a device for the specific purpose of voting. *Id*. at 951-952 (citation omitted). The Court also

---

[5] *See* 25 P.S. § 3031.1-3031.22, Art. XI-A, §§ 1101-A–1122-A, added by the Act of July 11, 1980, P.L. 600.

[6] For example, one such reference to "voting machines" in Article XI-A of the Election Code is found at 25 P.S. § 3031.4(b), which states: "Upon the installation of an electronic voting system in any election district, the use therein of paper ballots and of **voting machines** shall be discontinued, except as otherwise provided herein." 25 P.S. § 3031.4(b) (emphasis added). An additional example is found at 25 P.S. § 3031.9(a)(1), which reads: "Ballot labels used in conjunction with ballot cards shall, as far as practicable, be in the same order or arrangement as provided for paper ballots or **voting machine** ballots, except that such information may be printed in vertical columns or in a number of separate pages which are placed on the voting device." 25 P.S. § 3031.9(a)(1) (emphasis added).

reasoned that "voting machine" has been commonly defined in the dictionary as a "mechanical device for recording and counting votes cast in an election." *Id*. at 952 (citation omitted). In addition, the Court looked to a definition from the United States Election Assistance Commission, which defines a "voting machine" as "[t]he mechanical, electromechanical, and electric components of a voting system that the voter uses to view the ballot, indicate his/her selections, and verify those selections" that "[i]n some instances … also casts and tabulates the votes." *Id*. at 952 (citation omitted).

The Commonwealth Court also observed that Section 1101-A of the Election Code defines EVS, automatic tabulating equipment, and voting device, as follows:

> "[An EVS is a] system in which one or more voting devices are used to permit the registering or recording of votes and in which such votes are computed and tabulated by automatic tabulating equipment. The system shall provide for a permanent physical record of each vote cast." 25 P.S. § 3031.1. "Automatic tabulating equipment" is defined in that same part of the Election Code as "any apparatus which automatically examines and computes votes registered on paper ballots, ballot cards[,] or district totals cards or votes registered electronically and which tabulates such votes." *Id.* "Voting device" is also defined therein as
>
>> either an apparatus in which paper ballots or ballot cards are used in connection with an implement by which a voter registers his votes with ink or other substance or by punching, or an apparatus by which such votes are registered electronically, so that in either case the votes so registered may be computed and tabulated by means of automatic tabulating equipment.

*Id.* at 952-953 (some citations omitted).

Applying the above definitions, the Court reasoned it was evident that Lycoming County's optical scanners — which receive completed paper ballots, scan the votes thereupon, and transmit the results to a database — constitute "voting devices" containing automatic tabulating equipment, all of which are part of the County's EVS. *See Honey*, 312 A.3d at 953. The Court explained that these voting devices "undoubtedly" constituted

mechanical, electrical, electromechanical, or electronic components of a voting system specifically tasked for voting (including vote casting and tabulation), and, thus, also constituted "voting machines." *Id.*

Given Article XI-A's multiple references suggesting voting machines are components of EVSs, and that Sections 1702 and 1703 (25 P.S. §§ 3262-3263), when read together, indicate "EVS" is synonymous with "voting machine" — the Court reached two conclusions:

> First, the General Assembly's usage of the term "voting machines" in the Election Code is beset by inconsistencies and poor draftsmanship. Second, we must read Section 1104-A's reference to voting machines as pertaining to mechanical devices used in the voting process, but not to similarly deployed electronic devices, in order to harmonize those inconsistencies and to allow for the Election Code's provisions to be given the fullest effect possible.

*Honey*, 312 A.3d at 953.

Finally, the Court discussed the meaning of "contents" — which it again noted was not defined in the Election Code. *See Honey*, 312 A.3d at 953. It explained "contents" means "something contained" according to Merriam-Webster, such that CVRs qualify as "contents" per the Election Code, regardless of whether the container holding such CVRs is considered a ballot box or voting machine. *Id.* at 953-954 (citation omitted). The Commonwealth Court rejected the lower court's interpretation of "contents" as only including the ballots physically deposited in ballot boxes and the voting machines' mechanical innerworkings because:

> First, the voting machines used by Lycoming County compiled recorded votes in digital form, rather than physical. Thus, the machines had no "contents" beyond those digitized records, *i.e.*, the CVR. Second, it may appear at first blush that Section 308 is ambiguous in this context, in that it is not clear whether the ballot boxes' "contents" are just the physical ballots themselves or also include the voting data from those ballots. However, this apparent ambiguity disappears by virtue of [the trial court's] effective determination that the CVR is digitally equivalent to those physical ballots.

It would produce an absurd result if physical ballots were protected from public disclosure, but digital analogues of those very same ballots were freely available upon request, as what is special about the ballots is not so much the form which they take, but the voting information which they contain.

*Id.* at 954. In its view, "contents" in the Election Code is not ambiguous and CVRs constitute contents, such that CVRs are exempt from public disclosure. *Id*.

Both Judge McCullough and Judge Wallace dissented. Each would have affirmed the trial court's interpretation of the Election Code, finding a CVR is not shielded from disclosure.

Judge McCullough believed Section 308 of the Election Code clearly demonstrates that CVRs are not part of the voting machines or ballot boxes. She observed that Lycoming County solely uses paper ballots, which are inserted into a scanner and dropped into a black box/bag. Thereafter, officials retrieve USB drives containing data downloaded from the scanners. Judge McCullough emphasized that it is undisputed that the **scanners create a record**, for the purpose of assisting the vote tabulation. Judge McCullough relied on the Election Code's definition of "[**a**]**utomatic tabulating equipment**" as "any apparatus which automatically examines and computes votes **registered on paper ballots**, ballot cards or district totals cards or votes registered electronically and which tabulates such votes." *Honey,* 312 A.3d at 955 (McCullough, J., dissenting) (emphasis in original; citation omitted). In her view, the scanners used by Lycoming County fall within the definition of "automatic tabulating equipment" such that the scanners **are not ballot boxes or voting machines** and must be treated distinctly. *See id*. at 956.

In support, Judge McCullough underscored that Voter Services uses the data from the scanners to tabulate results, create reports, and produce other election-related data — including but not limited to the CVR itself. She noted that the CVR is (1) generated from information contained in Voter Services' central computer; (2) not physically located

in the voting machine or ballot box; and (3) stored electronically in Voter Services' central computer until it is printed out in a format **which does not resemble a ballot and does not contain identifiable voter information (especially since the order of the numbered list of voters does not correspond to the order in which ballots were cast)**. *See Honey,* 312 A.3d at 955 (McCullough, J., dissenting). In Judge McCullough's view, a CVR is clearly "not a copy of a ballot" — instead, it is a spreadsheet showing the disposition of every choice on every ballot cast in a given election. *Id.* Therefore, allowing the public to examine CVRs enables the public to cross-check the math performed by the board of elections to ensure that the tally of votes is consistent with the reported results. *Id.* at 956.

Judge Wallace similarly disagreed with the majority and concluded the EVS is not a voting machine, such that (and consistent with Section 308's text and purpose) the CVR is subject to public inspection as a report, other document, or other record. *Honey*, 312 A.3d at 956 (Wallace, J., dissenting). Pointing to *Banfield v. Cortes*, 110 A.3d 155 (Pa. 2015),[7] and Section 1104-A(b) of the Election Code, she reasoned that EVSs are **not** voting machines — given the separate treatment of these two items. *See* 25 P.S. § 3031.4(b) ("Upon the installation of an electronic voting system in any election district, the use therein … of voting machines shall be discontinued, except as otherwise provided [in

---

[7] In *Banfield*, the issue was "whether the Commonwealth Court erred in upholding the decision of the Secretary of the Commonwealth to certify certain direct-recording electronic voting systems (DREs) for use in Pennsylvania elections." *Banfield*, 110 A.3d at 159. The *Banfield* Court noted:

> DREs display an electronic ballot on a screen and allow an individual to vote using a button, dial, or touch screen. The DREs at issue do not produce a contemporaneous paper record of an individual's vote, but store each vote on internal memory. However, all of the DREs at issue are capable of printing the vote data at the close of the election[.]"

*Id.* This Court held, in relevant part, that the Election Code authorized DREs and did not infringe on voters' constitutional rights. *See id.* at 168, 178.

the Election Code.]").  Judge Wallace also explained that the recanvassing procedures described in Section 1118-A of the Election Code apply to some, but not all, electronic voting systems (as in recount procedures for traditional paper ballots apply to an EVS using paper ballots, while recanvassing procedures for voting machines apply to any other type of EVS).  From Judge Wallace's perspective, this demonstrates EVSs and voting machines are not synonymous.  She reasoned that Section 308's "contents" exception most clearly pertains to the recanvassing and recounting procedures outlined in the Election Code, which exist to ensure ballot boxes and voting machines are protected and preserved if there is a recanvass or recount.  *Honey*, 312 A.3d at 958. Here, she explained that if there were a recount, the ballots themselves (not the CVR), would be recounted.  Judge Wallace further emphasized that Section 308 of the Election Code explicitly permits the public to inspect election records containing various voting information, including **"reports and other documents and records"** and promotes the overall purpose of fostering public trust and transparency in our elections.  *Id*. at 957 (*citing* 25 P.S. § 2648; emphasis in original).  She maintained that the CVR most closely resembles a "report," as specifically identified in Section 308, or even "other documents and records" (Section 308's catchall provision).  *See id*. at 958.

Judge Wallace believed that permitting public inspection of a disputed CVR would not facilitate fraud — noting one of the purposes of Section 308's "contents" exception may be to mitigate fraud — nor would it violate voting secrecy, because CVRs lack identifying information and are randomized.  *Honey*, 312 A.3d at 958 (Wallace, J., dissenting).  Finally, though Judge Wallace recognized the public could misuse or misinterpret the information contained in the disputed CVR, she noted such critiques apply equally to other publicly available records and are policy considerations better considered by the Legislature, rather than the Court.

The present appeal followed, and we accepted the following issues for review.

## III. ISSUES

(1) Whether the language of Section 308 of the Election Code, 25 P.S. § 2648, exempts [c]ast [v]ote [r]ecords ("CVR") from public disclosure under the Right to Know Law, 67 P.S. §§ 67.101, *et seq*., because CVRs are the content of ballot boxes and/or voting machines as the terms are used in the Election Code.

(2) Whether the components of the Electronic Voting System ("EVS"), as defined in Section 1101-A of the Election Code, 25 P.S. § 3031.1 are considered "voting machines" under the Election Code.

(3) Whether [c]ast [v]ote [r]ecords ("CVR") are the "content" of ballot boxes and/or voting machines under Section 308 of the Election Code, 25 P.S. § 2648.

(4) Whether the use of "voting machines" was discontinued upon the installation of Electronic Voting Systems ("EVS") in election districts pursuant to Section 1104-A of the Election Code, 25 P.S. § 3031.4.

*Honey v. Lycoming Cnty. Offs. of Voter Servs.*, 327 A.3d 611 (Pa. 2024).

As will be discussed below, the first issue is dispositive;[8] therefore, we need not reach the remaining two issues in this case. Thus, our summary of the arguments and analysis is limited to that first issue.

## IV. LEGAL BACKGROUND

The Pennsylvania Constitution requires that secrecy in voting must be preserved. Specifically, "[a]ll elections by the citizens shall be by ballot or by such other method as may be prescribed by law: **Provided, [t]hat secrecy in voting be preserved."** PA. CONST. art. VII, § 4 (emphasis added).

However, the interest in secrecy in voting is balanced against the public interest in ensuring accurate and trustworthy election results. To ensure accurate and trustworthy

---

[8] The third issue is encompassed in our discussion of the first issue because they are substantially similar.

results, the Election Code permits the public inspection of election records, subject to certain provisions:

> The records of each county board of elections, general and duplicate returns, tally papers, affidavits of voters and others, nomination petitions, certificates and papers, other petitions, appeals, witness lists, accounts, contracts, reports and other documents and records in its custody, **except the contents of ballot boxes and voting machines and records of assisted voters**, shall be open to public inspection, except as herein provided, and may be inspected and copied by **any qualified elector of the county** during ordinary business hours, at any time when they are not necessarily being used by the board, or its employes having duties to perform thereto: Provided, however, That such public inspection thereof shall only be in the presence of a member or authorized employe of the county board, and shall be subject to proper regulation for safekeeping of the records and documents, and subject to the further provisions of this act: And provided further, That general and duplicate returns, tally papers, affidavits of voters and others, and all other papers required to be returned by the election officers to the county board sealed, shall be open to public inspection only after the county board shall, in the course of the computation and canvassing of the returns, have broken such seals and finished, for the time, their use of said papers in connection with such computation and canvassing.

25 P.S. § 2648 (emphases added). Other provisions of the Election Code also provide the public with means to verify election integrity. For example, Article XI, Section 1107 of the Election Code provides, in pertinent part:

> No voting machine shall, upon any examination or reexamination, be approved by the Secretary of the Commonwealth, or by any examiner appointed by [them], unless it shall, at the time, satisfy the following requirements:
>
> . . .
>
> (k) It shall have a counter, or other devi[c]e, the register of which is visible from the outside of the machine, which shall show during any period of voting the total number of voters who have operated the machine during said period of voting.

(l) It shall have a protective counter, or other device, the register of which cannot be reset, which shall record the cumulative total number of movements of the operating mechanism.

25 P.S. § 3007.  In other words, a voting machine is required to have a visible and protected counter to show the total number of voters who have operated the machine during a certain voting period.  Section 1107 also requires voting machine to have a lock or locks to prevent the movement of any registering mechanism.  *See id.* at § 3007(m).  Additionally, this section contains measures to protect secrecy, such as a requirement that a screen, hood, or curtain be employed to conceal the actions of the elector while voting.  *See id.* at § 3007(n).

Turning back to Article XI-A, Section 1104-A of the Election Code addresses the installation of electronic voting systems.  It explains a consequence of when a county board of elections adopts an electronic system in place of the use of paper ballots.  Notably, "[u]pon **the installation of an electronic voting system in any election district, the use therein of paper ballots and of voting machines shall be discontinued,** except as otherwise provided herein."  25 P.S. § 3031.4(b) (emphasis added).

Finally, we note that Article XVII, Section 1703 of the Election Code provides legal procedures for the public to enforce the interest in election integrity and accuracy.  Section 1703 guides the process to be followed when a petition to open a ballot box or to recanvass votes is filed:

(a)(1) Any petition to open a ballot box or to recanvass the votes on a voting machine or an electronic voting system pursuant to sections 1701 and 1702 shall be filed no later than five (5) days after the completion of the computational canvassing of all returns of the county by the county board. If any error or fraud is found the court shall grant the interested parties an additional five (5) days to file petitions requesting additional ballot boxes to be opened or voting machines or electronic voting systems to be recanvassed.

(i) Except as set forth in subclause (ii):

(A) a recount or recanvass shall include all election districts in which ballots were cast for the office in question; and

(B) petitions, accompanied by the appropriate money or bond, must be filed in each election district in accordance with this act.

(ii) Subclause (i) shall not apply if a petitioner under section 1701 or 1702 pleads that a particular act of fraud or error occurred and offers prima facie evidence supporting the allegation.

(2) If any petition to open a ballot box or to recanvass the votes on a voting machine or an electronic voting system shall have been presented, under the provisions of sections 1701 and 1702 of this act and the court shall discover therein any fraud or error, the court shall correct, compute and certify to the county board the votes justly, regardless of any fraudulent or erroneous entries made by the election officers thereof, and the county board shall correct accordingly any entries previously made in the returns of the county being prepared by it, or which have been prepared and not yet certified.

25 P.S. § 3263(a)(1) (footnote omitted).  With these constitutional and statutory provisions in mind, we turn to the arguments before us.

## V. ARGUMENTS

### A. Appellants, Intervenors

Appellants assert CVRs do **not** constitute the content of ballot boxes for purposes of Section 308 of the Election Code.  They rely on both Deputy Secretary for Elections and Commissions of the Department of State, Jonathan Marks, and Director Forrest Lehman, who opine that the only things contained in the ballot box are "ballots."  *See* Appellants' Brief at 22 (citations omitted).  They specifically highlight Deputy Secretary Marks's testimony that he would not describe Lycoming County's election management system as a "voting machine" because the election management system is "more of a nerve center" while "[t]he voting machines are the individual units, whether they're at the

precinct or central tabulator[.]"  *Id.* at 22-23 (citation omitted).  Deputy Secretary Marks believed the Department of State construed the term "the contents of voting machines … broadly because the General Assembly did not amend it when new types of voting systems came along."  *Id.* at 24 (citation omitted).   Director Lehman also described a CVR as "a spreadsheet" that "resides on the central computer in Voter Services" containing "just under 60,000 rows of data" for the November 2020 election, where "each row contains a variety of different information, meta-data, that is associated with each one of those ballots that was cast in the election."  *Id.* at 23 (citation omitted).

Moreover, Director Lehman testified that the CVR on the central computer "is an accumulation of Cast Vote Records from every precinct, scanner and central scanner that was a part of the November 2020 election."  Appellants' Brief at 23-24 (citation omitted); *see also id.* at 24 (citing Director Lehman's testimony that the information contained in the central computer allows the public to see reports regarding how many people voted for each candidate).  Appellants add that Lycoming County's central computer simply cannot constitute a "voting machine."  *Id.* at 24.  In their eyes, CVRs (which are generated from the central computer) are not the "contents of voting machines."  *Id.*  Since Lycoming County no longer uses Article XI (of the Election Code) voting machines, CVRs cannot represent "contents of voting machines" as used in Section 308.  *See id.*

Appellants urge us to remember that Voter Services carries the burden of demonstrating, by a preponderance of the evidence, that the records they seek are exempt from public disclosure.  They note that, under the RTKL, a record in the possession of a local or Commonwealth agency is presumed to be public.  Appellants cite *McKelvey v. Pa. Dep't of Health*, 255 A.3d 385 (Pa. 2021), for the proposition that the RTKL is "remedial legislation to facilitate government transparency and promote accountability" by "dramatically expand[ing] the public's access to government

documents" and "prohibit[ing] secrets [and] scrutiniz[ing] the actions of public officials" in an effort by the Legislature "to expand government transparency" and "make public officials accountable for their actions." Appellants' Brief at 25 (*citing McKelvey*, 255 A.3d at 399-400). They emphasize *McKelvey*'s pronouncement that the RTKL "must be construed to maximize access to public records that are in an agency's possession" and that "the exemptions from disclosure [regarding the RTKL] must be strictly construed." *Id.* at 26 (*citing McKelvey*, 255 A.3d at 400). Because Voter Services's sole basis for opposing disclosure of the CVRs is its belief that the CVRs constitute the contents of ballot boxes or voting machines under Section 308 (since that section prohibits the disclosure of such records), and CVRs **do not** constitute such contents, Appellants assert Voter Services failed to carry its burden of proof. They rely on Deputy Secretary Marks' testimony that "other states explicitly make [CVRs] a public record." *Id.* at 27 (citation omitted); *see also id.* at 27-28 (reciting that "[p]roactively releasing [CVRs] to the public bolsters transparency and could reduce the volume of public records requests" and noting that "[m]any election jurisdictions already post CVRs or ballot images without issue[,]" including Los Angeles, California; Dane County, Wisconsin; and various counties in Colorado (citation omitted)).

## B. Appellee, Voter Services

Voter Services begins by noting the Election Code does not specifically define "ballot boxes" and "voting machines." However, it asserts that these terms, as used in Section 308 of the Election Code, are not ambiguous. Voter Services argues that, pursuant to common understanding and parlance, a ballot box is "a thing into which cast ballots are deposited." Voter Services's Brief at 9 (*citing* Merriam-Webster ("BALLOT BOX"), https://www.merriamwebster.com/dictionary/ballotbox (last accessed 4/22/2026) (defining "ballot box" as "a box for receiving ballots"). Thus, it contends the black, locked

bags attached to Lycoming County's scanners are ballot boxes as understood in the Election Code.  It further relies on Merriam-Webster's definitions of a "machine" as "a mechanically, electrically, or electronically operated device for performing a task" and a "voting machine" as "a mechanical device for recording and counting votes cast in an election[,]" *Id.* (*citing* Merriam-Webster ("MACHINE"), https://www.merriamwebster.com/dictionary/machine and ("VOTING MACHINE") https://www.merriamwebster.com/dictionary/votingmachine (last accessed 4/22/2026)). Therefore, to Voter Services, a "voting machine" is "a mechanical, electric, or electronic device for recording and counting votes."  *Id.*  Because its scanners and tabulators are devices used for the purpose of recording and counting votes, it maintains they are voting machines as defined by Section 308 of the Election Code.  *See id.*

Furthermore, Voter Services argues by extension that the contents of those scanners and tabulators (the CVRs) **constitute the contents of voting machines**. Therefore, they are public records exempt under the Election Code from disclosure by the RTKL or any other law.  *See* Voter Services's Brief at 9-10.  Were CVRs not shielded from public disclosure, Voter Services fears an anomalous result that would shield cast ballots from public view but allow the public disclosure of the very same information contained on those ballots — a result it calls "absurd and unreasonable."  *Id.* at 10. Section 102 of the RTKL, 65 P.S. § 67.102, defines a "record" as "[i]nformation, **regardless of physical form or characteristics**, that documents a transaction or activity of an agency[.]"  Voter Services's Brief at 10 n.3 (citing 65 P.S. § 67.102) (emphasis added).  As such, Voter Services maintains that the physical form in which that information appears is irrelevant, as the non-public information appearing on the physically cast ballots constitutes the same information appearing on the CVR.  Therefore, it states, the information on both forms must be protected from public disclosure.

Voter Services also asserts that CVRs further **constitute contents of ballot boxes** because each line of the CVR is essentially "a digital version of each ballot cast in the election." Voter Services's Brief at 10. It points out that, once scanned, the ballots are placed in locked black bags attached to the scanners. It insists these bags are ballot boxes, and the cast ballots are its only contents. Voter Services also reasons that, if CVRs are simply digital versions of cast ballots, then public disclosure is prohibited by the Election Code. Otherwise, it claims we would again reach an absurd result by permitting what is essentially the public disclosure of the cast ballots. In its view, the reproduction of cast ballots would threaten the secrecy of the vote as secured by Article VII, Section 4 of the Pennsylvania Constitution. *See id.* at 11. Voter Services acknowledges that voter numbers are randomized for CVR purposes in Lycoming County, such that the risk to secrecy is lessened. However, it fears such protections may not apply in other counties and with other voting systems. *See id.*

Lastly, Voter Services reasons that even if there is ambiguity, the Department of State's interpretation must be given deference. *See* Voter Services's Brief at 11 (*citing Winslow-Quattlebaum v. Maryland Ins. Group*, 752 A.2d 878, 881 (Pa. 2000)). It observes the Department of State is legislatively endowed with the power and duty of administering the Election Code and that, according to Deputy Secretary Marks, the Department holds the opinion that CVRs are not subject to public disclosure. *See id.* Since there has been no suggestion of bad faith, fraud, abuse of discretion, or arbitrariness in the Department's interpretation of Section 308, Voter Services asserts this Court should defer to it. *See id.* at 11-12.

### C. Appellee, Secretary of the Commonwealth (Al Schmidt)

The Secretary agrees with Voter Services that "contents of" "ballot boxes" and "voting machines" are not ambiguous terms.[9]  He references Merriam-Webster definitions: (1) "contents" as "something contained"; (2) "[o]f" as "indicat[ing] origin or derivation"; (3) "ballot box" as "a box for receiving ballots"; (4) "machine" as "a mechanically, electrically, or electronically operated device for performing a task"; and (5) "voting machine" as "a mechanical device for recording and counting votes cast in an election."  Secretary's Brief at 19-20 (citations omitted).  He cites the United States Election Assistance Commission's Glossary of Election Terminology for "voting machine," which defines the term as "the mechanical, electromechanical, and electric components of a voting system that the voter uses to view the ballot, indicate his/her selections, and verify those selections" that sometimes "also casts and tabulates the votes."  Secretary's Brief at 20-21 (citation omitted).

The Secretary argues that "contents of ballot boxes and voting machines" should be read to mean "the actual votes or choices made by any particular voter because that information originates or is derived from either a ballot box or a voting machine."  Secretary's Brief at 21.  In reliance thereon, he cites Deputy Secretary Marks's testimony that he was unaware of anything other than voted ballots in the ballot box and that CVRs constitute a "digital representation" of the ballot box's contents because it is "a recreation of each voted ballot" that "resides on the voting machines."  *Id.*  (citation omitted).  He also recounts Director Lehman's explanation of CVRs as the digital reproduction of all voting data for all votes cast that are contained in the ballot boxes, and emphasizes the director's assertion that the flash drive or USB stick containing the information from the

---

[9] Because Appellants purportedly failed to present argument that these terms are ambiguous or that the Department's interpretation does not deserve deference, the Secretary also avers these arguments are waived.

scanners is in the voting machine. *See id.* (citation omitted). Like Voter Services, the Secretary finds it absurd to protect voter information displayed on a physical, voted ballot, yet allow public dissemination of that same information once transferred to another format (*i.e.*, the CVR). Thus, the Secretary asserts Appellants' argument that the CVR is merely a report ignores the fact, as found by the trial court, that the CVR is the digital equivalent of all voted ballots. Therefore, format is irrelevant.

The Secretary believes the CVR constitutes the "contents of voting machines" because it is comprised of the "information that originates and derives from ballots that are scanned by the EVS." Secretary's Brief at 26 (citations omitted). He explains the CVR has "a single line-by-line row of data for every individual ballot that was cast for that election[,] showing how each of those ballots was cast for every office[.]" *Id.* at 26 (citation omitted). Thus, it "contains all of the voter's selected choices from each ballot that is deposited into the precinct scanners and thus represents a compilation of every single voted ballot." *Id.* (citation omitted). He also characterizes CVRs as "the modern analog of [ ] counters" (which are shielded from public examination) because CVRs contain "the raw, unreviewed data, *i.e.*, the contents of the machines." *Id.* at 41 (citation omitted).

Additionally, the Secretary reiterates that Pennsylvania law only allows public access to the contents of ballot boxes and voting machines upon a petition to the court based upon fraud or error allegations. *See* Secretary's Brief at 27 (*citing* 25 P.S. §§ 3261-3263). In other words, if we permit Appellants to obtain this content simply by filing an RTKL request, we would circumvent the Election Code. *See id.* Likewise, the Election Code already includes numerous requirements to promote election transparency and integrity, including: (1) district election officers take oaths before receiving authorization to conduct their jobs; (2) County Boards of Election meet in public sessions and take actions in those sessions; (3) candidates and parties are permitted to have watchers

present at vote counting and canvassing events and the election; and (4) the Election Code contains various robust recount and election contest provisions and provides penalties for specific violations. *See id.* at 36 (citations omitted).

Lastly, like Voter Services, the Secretary argues that the Department's interpretation that CVRs fall under the phrase "contents of ballot boxes and voting machines" should be afforded deference since there have been no allegations of bad faith, fraud, arbitrary action, or abuse of discretion by the Department in interpreting the Election Code. *See* Secretary's Brief at 37-38. The Secretary suggests the Department possesses the regulatory expertise to offer guidance on the meaning of Section 308 of the Election Code. Further, since the Deputy Secretary and Lycoming County's Election Director both believe CVRs are the modern version of ballot box contents, this interpretation is logical and reasonable, and therefore, owed deference. *See id.* at 39-41.

## VI. DISCUSSION

As mentioned above, this appeal is resolved by answering the first question: Are CVRs the "contents of" "ballot boxes" or "voting machines" under Section 308 of the Election Code? To answer this question, we first look to the history of the Election Code. The resolution then requires us to construe Section 308 in conjunction with the constitutional concerns surrounding voter secrecy under Article VII, Section 4 of the Pennsylvania Constitution.

Because this issue involves statutory construction, we note, at the outset, that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). "However, if we deem the statutory language ambiguous, we must [] ascertain the General Assembly's intent by statutory analysis, wherein we may consider numerous relevant

factors." *Bowman v. Sunoco, Inc.*, 65 A.3d 901, 906 (Pa. 2013) (citing 1 Pa.C.S. § 1921(c)). "An ambiguity exists when language is subject to two or more reasonable interpretations and not merely because two conflicting interpretations may be suggested." *Tri-Cnty. Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 510 (Pa. Cmwlth. 2014). Whether or not a statute is deemed ambiguous, our rules of statutory construction forbid a court from adopting an interpretation that will produce "a result that is absurd, impossible of execution[,] or unreasonable." 1 Pa.C.S. § 1922(1).

Here, much of the confusion concerning the interpretation of the term "contents of ballot boxes and voting machines" is a product of the age of the Election Code, which was first enacted in 1937. Section 308 and Article XI (which governs voting machines) were enacted at that time, and have not been comprehensively amended since.

In 1980, the General Assembly added Article XI-A, which governs EVSs. The *Banfield* Court provided the following concise history of the Election Code:

> The Election Code … **initially permitted voting with paper ballots or mechanical lever voting machines**. 25 P.S. §§ 2961-71 (ballots); 25 P.S. §§ 3001-18 (voting machines). In 1980, the General Assembly amended the Election Code to allow the use of **electronic voting systems, which include optical scanners, punch card systems, and [direct-recording electronic voting systems or] DREs**. 25 P.S. §§ 3031.1-3031.22 (electronic voting systems). Optical scanners (akin to standardized testing methods) and punch card voting allows voters to mark selections on a paper ballot that is subsequently scanned and counted by an automatic tabulation device. In contrast, DREs display an electronic ballot on a screen and allow an individual to vote using a button, dial, or touch screen. The DREs at issue do not produce a contemporaneous paper record of an individual's vote, but store each vote on internal memory. However, all of the DREs at issue are capable of printing the vote data at the close of the election; some DREs print on full sheets of paper while others print on thermal paper, which is commonly used for printing receipts. In addition, electronic vote data can be removed from the DRE on external memory devices, such as flash drives and memory cards, and connected to a different electronic system to tally the votes.

> In October 2002, Congress enacted the Help America Vote Act … to reform the nation's voting process in response to the issues that arose in the 2000 presidential election. **One of HAVA's main purposes was to authorize funding for the replacement of lever and punch card voting machines with other systems that are HAVA compliant**.

*Banfield*, 110 A.3d at 159-160 (emphases added; some citations and footnote omitted).

Certain provisions of the Election Code were modified in 2004, such as 25 P.S. § 3154(e)(1) (regarding the computation of returns and certification matters) and 25 P.S. §§ 3262 and 3263 (regarding the recanvassing of voting machines and correction of returns, respectively). Then, in 2019, the General Assembly passed Act 77,[10] which included two provisions regarding absentee and mail-in ballots: 25 P.S. §§ 3146.9[11] and 3150.17.[12] As this Court recently explained in *McLinko v. Dep't of State*, 279 A.3d 539 (Pa. 2022), Act 77 "effected major amendments to the Pennsylvania Election Code" because it "eliminated the option for straight-ticket voting; moved the voter registration deadline from thirty to fifteen days before an election; allocated funding to provide for upgraded voting systems; and reorganized the pay structure for poll workers, along with other administrative changes." *McLinko*, 279 A.3d at 543 (footnote omitted). Moreover,

---

[10] Act of October 31, 2019, P.L. 552, No. 77.

[11] 25 P.S. § 3146.9 is titled "Public records" and states, in pertinent part: "**All official absentee ballots**, files, applications for such ballots and envelopes on which the executed declarations appear, and all information and lists **are hereby designated and declared to be public records** and shall be safely kept for a period of two years, except that no proof of identification shall be made public, nor shall information concerning a military elector be made public which is expressly forbidden by the Department of Defense because of military security." 25 P.S. § 3146.9(a) (emphases added).

[12] 25 P.S. § 3150.17 also is titled "Public records" and states in pertinent part: "**All official mail-in ballots**, files, applications for ballots and envelopes on which the executed declarations appear and all information and lists **are designated and declared to be public records** and shall be safely kept for a period of two years, except that no proof of identification shall be made public, nor shall information concerning a military elector be made public which is expressly forbidden by the Department of Defense because of military security." 25 P.S. § 3150.17(a) (emphases added).

"Act 77's universal mail-in provisions extended the ability to receive and return a ballot through the mail to the electorate without the excuse of absenteeism." *Id.* at 544.

Despite its attempt at modernizing the Election Code upon the advent of EVSs in 1980 and its enactment of Act 77 in 2019, the **Legislature has never comprehensively updated the Election Code since its establishment in 1937**.

We now turn to the statutory text at issue. Section 308 permits public inspection of "records of each county board of elections, general and duplicate returns, tally papers, affidavits of voters and others, nomination petitions, certificates and papers, other petitions, appeals, witness lists, accounts, contracts, reports and other documents and records in its custody, except **the contents of ballot boxes and voting machines** and records of assisted voters" by "any qualified elector." 25 P.S. § 2648 (emphasis added).

"Contents" is not defined under the Election Code. Under its plain meaning, "content" is defined as "something contained[,]" noting this word is typically used in plural form. Merriam-Webster ("CONTENT"), https://www.merriam-webster.com/dictionary/content (last accessed 4/22/2026).

Applied to the matter *sub judice*, there appears to be no debate that the actual physical ballots cast in an election constitute "contents of" a ballot box because there is physically nothing else there. The physical ballot is clearly "something contained" in the ballot box. As for a voting machine, an individual either electronically selects a candidate (or ballot measure choice) or runs the physical ballot through a scanner, such that the "contents" of the vote are digitally cast in the voting machine. That digital ballot is "something contained" in the voting machine.

This leads us to the contested document — CVRs. CVR stands for "cast vote **record**." It is essentially a spreadsheet "report" of the votes cast that serves as an official "document" of the votes cast in Lycoming County. *See Honey,* 312 A.3d at 955-956

(McCullough, J., dissenting); *id.* at 957 (Wallace, J., dissenting).  The question is whether CVRs are considered contents of ballot boxes or voting machines.  In other words, is the CVR spreadsheet report protected content of a ballot box or a voting machine?  As mentioned above, the trial court found it was unclear whether "contents" also include the **intangible information**, such as ideas or facts, contained within the ballot boxes or voting machines (*i.e.*, what is written on the cast ballots).  *See* Opinion and Order, 12/16/2022, at 57-58.

Nothing in Section 308's text defines the scope of "contents of" as including or excluding the intangible information contained on a cast ballot.  However, if "contents of" encompasses the **information** on the ballots (and not just the physical or digital ballot), then the results of elections under specific circumstances could not be disclosed.  For example, where only one elector in a precinct voted, announcing a victor would reveal how that elector voted.  Similarly, the margin of victory would be required to be held secret if the vote in a precinct was unanimous.  Such a maximalist interpretation is clearly not what is meant by Section 308.

Instead, the "contents of ballot boxes" as applied to the facts of this case are the physical ballots actually contained in the ballot box.  Ergo, CVRs do not fit within this definition.  Rather, CVRs are spreadsheets of **raw data pulled from the cast ballots. They are not the physical ballots contained in the ballot box.**  Thus, under the applicable "something contained" definition of "contents," CVRs are not the "**contents of** ballot boxes" as contemplated by Section 308.

This interpretation does not destroy the secrecy of the vote any more than a tally of all votes from a specific election. As all parties acknowledge, the CVRs in this case do not reveal the contents of any single ballot.[13]

Having concluded CVRs are not contents of ballot boxes, we now turn to the question of whether CVRs are contents of a "voting machine." A voting machine is not explicitly defined in Section 308 (nor any other Election Code section). However, various sections of the Election Code describe voting machines as machines in which a ballot is cast. *See* 25 P.S. §§ 3001(4), 3154(e)(1)(i)(C), and 3262-3263. 25 P.S. § 3007 discusses certain requirements for voting machines, such as: (1) a counter or other device for indicating the total number of voters who have used the machine in a given period; (2) a counter for the total number of movements of the operating mechanism; (3) a lock to prevent movement of the registering mechanism after polls close; and (4) a design that precludes individuals from seeing the number of votes registered for any candidate or from tampering with the registering mechanism. *See* 25 P.S. § 3007. Read together, it becomes clear that a "voting machine" is simply the actual machine a voter uses to cast a vote.[14]

---

[13] Voter Services forcefully argues that it is possible other counties do not randomize personally identifying data in CVRs. We acknowledge that possibility, but we decide only the case before us. Whether the Election Code requires disclosure of CVRs that clearly link the contents of a ballot with personally identifying data is not before us.

[14] Admittedly, our case law only partially supports this view — though we believe that is a function of "voting machine" being an **antiquated term in the context of election modernization**. Cases from this Court and the Commonwealth Court support the view that voting machines are the machines through which a voter casts their vote, but only insofar as voting machines constitute **mechanical machines** requiring the voter to pull a lever to make their selection. *See In re Election of Supervisor in Springfield Twp., Mercer Cnty.*, 159 A.2d 901 (Pa. 1960); *In re Primary Election Apr. 28, 1964*, 203 A.2d 212 (Pa. 1964); *Appeal of Yerger*, 333 A.2d 902 (Pa. 1975); *Banfield, supra*; *Dayhoff v. Weaver*, 808 A.2d 1002 (Pa. Commw. 2002); and *In re Recount of Berks Cnty. Gen. Election of Nov. 8, 2022*, 296 A.3d 64 (Pa. Commw. 2023), *appeal granted, order aff'd*, 297 A.3d 687 (continued…)

Other considerations support this conclusion. Merriam-Webster defines a voting machine as "a mechanical device for recording and counting votes cast in an election[.]" Merriam-Webster ("VOTING MACHINE"), https://www.merriam-webster.com/dictionary/voting%20machine (last accessed 4/22/2026). The United States Election Assistance Commission (EAC) defines "voting machine" as "[t]he mechanical, electromechanical, and electric components of a voting system that the voter uses to view the ballot, indicate his/her selections, and verify those selections" that "[i]n some instances … also casts and tabulates the votes." *See* Glossary of Election Terms, United States Election Assistance Commission, at 107, available at: https://www.eac.gov/sites/default/files/glossary_files/Glossary_of_Election_Terms_EAC.pdf (last accessed 4/22/2026).

Taken together, the EAC's definition and the various provisions of the Election Code provide a useful structure for analyzing the relevant steps in an election. First, an elector must be informed of the information on the blank ballot — what offices are at stake and any nominees for the office. Second, electors must be allowed to cast their vote for their preferred candidates. Third, electors must be able to verify their selected preferences. Fourth, electors' selected preferences must be cast (registered or recorded). Fifth, all eligible electors' votes must be tabulated (though the tabulation may proceed through multiple steps for elections that encompass more than one precinct).

---

(Pa. 2023), and *overruled by Honey v. Lycoming Cnty. Offs. of Voter Servs.*, 312 A.3d 942 (Pa. Commw. 2024). These cases thus have a more constrained view of the definition of "voting machines" — one that seemingly does not include something like the scanner used in Lycoming County (but one that certainly does not include the tabulator used here).

Under this analysis, the essential characteristics of a "voting machine" are steps one through three, while steps four and five may or may not be present.[15]  In contrast, the Election Code defines a "voting device" as any device performing step four.[16]  Thus, the definition of voting device includes some voting machines — those voting machines that perform step four.  However, not all "voting devices" fall within the definition of "voting machines."  For example, a scanner that reads a paper ballot is a "voting device," but not a "voting machine."

"Automatic tabulating equipment" is defined as machines that perform step five.[17]  In turn EVSs are defined as one or more "voting devices" combined with automatic tabulating equipment.[18]  Thus, EVSs are a combination of machines that perform steps four and five.

Here, Lycoming County's **scanners constitute voting devices** but not voting machines.  Similarly, Lycoming County's **tabulators** (which no party disputes are responsible for generating the CVRs) **are automatic tabulating equipment**, as they perform step five — tabulating electors' votes.  But they are neither voting devices (they do not record an elector's vote; step four) nor are they voting machines (they do not

---

[15] While the issue of DREs, as addressed in *Banfield*, are not currently before us, it would appear that DREs are voting machines that perform all five steps.

[16] "[E]ither an apparatus in which paper ballots or ballot cards are used in connection with an implement by which a voter registers his votes with ink or other substance or by punching, or an apparatus by which such votes are registered electronically, so that in either case the votes so registered may be computed and tabulated by means of automatic tabulating equipment."  25 P.S. § 3031.1.

[17] "[A]ny apparatus which automatically examines and computes votes registered on paper ballots, ballot cards[,] or district totals cards or votes registered electronically and which tabulates such votes."  25 P.S. § 3031.1.

[18] "[A] system in which one or more voting devices are used to permit the registering or recording of votes and in which such votes are computed and tabulated by automatic tabulating equipment.  The system shall provide for a permanent physical record of each vote cast."  25 P.S. § 3031.1.

provide the elector the opportunity to indicate and verify their preferences; steps one through three).  Thus, a CVR does not qualify as content of a voting machine, but rather the spreadsheet report generated by the automatic tabulating equipment.

This conclusion is further buttressed by the various provisions of the Election Code that make evident that "**voting machines**" are **not synonymous with** "**electronic voting systems**."  The Election Code, at 25 P.S. § 3263, discusses "[a]ny petition to open a ballot box or to recanvass the votes on a voting machine **or** an electronic voting system" and repeatedly refers to "voting machine[s]" **or** "electronic voting system[s]."  This definition clearly reflects that voting machines and EVSs are distinct entities.  Otherwise, the term "voting machines" would be mere surplusage.[19]  Further, when the General Assembly amended the Election Code to add Article XI-A (pertaining to EVSs), it did so **without amending** the articles pertaining to voting machines or otherwise combining those provisions.  Finally, Section 3031.4(b)'s command that "[u]pon the installation of an electronic voting system in any election district, the use therein of … voting machines shall be discontinued, except as otherwise provided herein[,]" would be nonsensical if voting machines and EVSs meant the same thing.  25 P.S. § 3031.4(b).

In accordance, Section 308 expressly **requires** the public disclosure of CVRs as "reports and other documents and records"[20] in Voter Services' custody.  25 P.S. § 2648.  While neither Section 308 nor any other Election Code provision defines "reports," "documents," and "records," CVRs plainly fall within the common usage of these terms.

---

[19] "In construing a statute, the courts must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage."  *City of Phila. Fire Dep't v. W.C.A.B. (Sladek)*, 195 A.3d 197, 207 (Pa. 2018) (citation omitted).

[20] Section 308 of the Election Code states, in relevant part: "The records of each county board of elections … reports and other documents and records in its custody … shall be open to public inspection[.]"  25 P.S. § 2648.

For example, "report" is defined as "a usually detailed account or statement" (*i.e.*, a news report). Merriam-Webster ("REPORT"), https://www.merriam-webster.com/dictionary/report (last accessed 4/22/2026). A "document" is "an original or official paper relied on as the basis, proof, or support of something" or "a writing conveying information" (*i.e.*, financial or historical documents). Merriam-Webster ("DOCUMENT"), https://www.merriam-webster.com/dictionary/document (last accessed 4/22/2026). A "record" is defined as "a collection of related items of information (as in a database) treated as a unit." Merriam-Webster ("RECORD"), https://www.merriam-webster.com/dictionary/record (last accessed 4/22/2026). Accordingly, Section 308 does not ban the disclosure of CVRs. In fact, by the very nature and purpose of CVRs — disclosure is required.

Finally, we address whether the RTKL applies to documents subject to the Election Code. The RTKL specifically yields to any federal or state law provisions that conflict with those of the RTKL. *See* 65 P.S. § 67.3101.1. Here, there is a conflict between the RTKL and the Election Code with respect to the process by which an individual may access public records. As Appellees and supporting *amici* emphasize, RTKL requesters may seek records during an agency's regular business hours, for any reason, so long as they are legal residents of the United States. By contrast, Election Code requesters must be qualified electors and may only access public records during normal business hours in the presence of a member or authorized county board member and subject to the county board of elections' safekeeping concerns. *Compare* 65 P.S. §§ 67.701(a), 67.102, and 67.1308 *with* 25 P.S. § 2648. Thus, we emphasize that to the extent CVRs are subject to public disclosure, they are subject to disclosure pursuant to the Election Code, not the RTKL. As such, requesters **must follow the procedure for review as laid out in the**

**Election Code**[21] — they cannot simply obtain review *via* the RTKL, as the Election Code governs the disclosure of these records.

In summary, (1) voting machines are machines in or through which an elector may indicate their preferences and cast their vote in an election; (2) voting devices record the elector's preferences; (3) automatic tabulating equipment tabulate electors' votes; (4) EVSs are systems of voting devices and automatic tabulating equipment; and (5) voting machines are not synonymous with automatic tabulating equipment or EVSs; (6) the CVRs at issue are the spreadsheet reports generated by the automatic tabulating equipment; and, as such (7) are required to be disclosed under the Election Code. The record demonstrates voters run their paper ballots through the scanners (*i.e.*, cast their vote), the scanners transmit that data to the tabulator, and the tabulator examines and computes the votes registered on those ballots. Thus the **tabulators do not** constitute voting machines. The CVRs generated by these tabulators are not protected from disclosure under the Election Code as the "contents" of "voting machines."

Finally, we address Appellees' concern that if CVRs are disclosed, one could compare the published voter lists against the CVR to identify who voted for whom. This raises concerns regarding the constitutional command for voter secrecy. *See* PA. CONST. art. VII, § 4. As explained above, the published voter lists contain a numbered list of the individuals who voted in a given precinct, chronologically ordered based on the order of voters who check in at the precinct on election day. When that person casts his ballot, that ballot receives a number, which corresponds to the order in which the ballot was cast compared to all ballots cast in that precinct on election day. These ballots are then scanned, and that scan generates a tabulation of the precinct results — the printout of which is the CVR. The CVR is a line-by-line spreadsheet of all votes cast in the precinct.

---

[21] *See* 25 P.S. § 2648.

Rows one through ten of the spreadsheet consist of the first ten ballots cast, **but not in sequential order**. Instead, the order of those first ten ballots cast, as represented in the spreadsheet, is randomized. In other words, in the CVR, the first ten ballots cast are randomly ordered (1-10), the next ten cast are randomly ordered (11-20), the third set of ten cast are randomly ordered (21-30), and so on and so forth. Thus, the number in the CVR does not correspond to the order in which the vote was cast in the precinct, and the order in which a voter checks in at the precinct (*i.e.*, the voter's number on the published voter list) does not correspond to the order in which it was cast. These two randomization elements significantly decrease the likelihood of identifying an individual vote based on the disclosure of the CVR. Further, officials have the capability of randomizing the entire spreadsheet so the entries are not solely randomized by chronological groups of ten. *See* R.R. Vol. 2 at 335a-354a. Another layer of randomization protection would be to randomize the published voter lists — which, in some precincts and counties, may require officials to transfer handwritten lists to digital lists, so this randomization can occur. These multiple levels of randomization alleviate any concern about voter secrecy making voter identification remote and minimal — no greater than with the publication of a numbered list of voters where only one voter in a precinct voted or all voters in a precinct voted for the same candidate.

Disclosure of the Lycoming County CVRs at issue here does not fundamentally violate the constitutional command of voter secrecy. We acknowledge Voter Service's concern that not all counties may follow the same randomization procedures that are established on this record. We recognize that, under certain circumstances, it is possible that a county's method of generating CVRs may violate the secrecy mandate. But that is a question to be addressed on a case-by-case basis.

## VII. CONCLUSION

Disclosure of CVRs allows the public to "check the math" of Voter Services to ensure the number of reported votes match the number of recorded votes. Such disclosure promotes fair, honest, and transparent elections, which strikes to the heart of "trust but verify." As is the case here, requesters may view spreadsheets of raw voting data, the originals of which are kept by Voter Services and ClearVote to prevent any attempts to alter the data in the CVRs. Disclosure facilitates greater trust in our elections, boosts confidence in electoral integrity and protects and promotes the legitimacy of our election outcomes. Simultaneously, disclosure will not violate our voter secrecy law any more than a tally of votes. Accordingly, for the reasons above, we reverse the order of the Commonwealth Court.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy and Brobson join the opinion.

Justice Wecht files a concurring opinion.